### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

**WILLIAM ARROYO-FLORES**,

      Plaintiff,

      v.                                    Civil No. 15-1998 (BJM)

**IPR PHARMACEUTICAL, INC.**,

      Defendant.

### OPINION AND ORDER

Alleging discrimination, harassment, and retaliation, William Arroyo-Flores ("Arroyo") brought this action against IPR Pharmaceutical, Inc. ("IPR") under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Puerto Rico Law 115 ("Law 115"), P.R. Laws Ann. tit. 29, § 194a *et seq.*, Puerto Rico Law 100 ("Law 100"), P.R. Laws Ann. tit. 29, § 146, Puerto Rico Law 80 ("Law 80"), P.R. Laws Ann. tit. 29, § 185a *et seq.*, Puerto Rico Law 44 ("Law 44"), P.R. Laws Ann. tit. 1, § 501 *et seq.*, and Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. Laws Ann. tit. 31, § 5141. Docket No. 1 ("Compl.") at 12–14. IPR moved for summary judgment, Docket Nos. 19, 35, and Arroyo opposed. Docket Nos. 31, 41. The case is before me on consent of the parties. Docket No. 13.

For the reasons set forth below, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the

initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[1] submissions.[2]

---

[1] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the district court may "forgive" a violation of Local Rule 56, litigants ignore the rule, which is meant to prevent the court from ferreting through the evidentiary record, "at their peril." *See Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

[2] IPR's Statement of Uncontested Facts ("SUF"), Docket No. 18, and Arroyo's Opposing Statement of Facts ("OSF"), Docket No. 31-1. IPR contends the OSF did not strictly comply with Local Rule 56, though it acknowledges that most of the SUF's facts were admitted by the OSF. To the extent some of the lengthier statements in the OSF violate Local Rule 56(c), I find that it is appropriate to excuse this violation for four reasons. *See Mariani-Colón*, 511 F.3d at 219. First, because the OSF admits most of the facts in the SUF, there are not too many statements in the OSF that are actually in question. Second, while IPR is correct that some of the statements in the OSF are unresponsive to the SUF's statements, many of the statements in the OSF actually do "qualify" the statements in the SUF. Third, because Arroyo's opposition to the summary judgment motion highlights many of the statements in the OSF, IPR can hardly claim that it is unaware of, or surprised by, the factual issues that are in dispute. Fourth, IPR elected not to file a reply statement of facts ("RSF"), leaving uncontested many of the facts brought to light in the OSF.

### The Parties

IPR manufactures pharmaceuticals and is regulated by state and federal laws and the Food and Drug Administration. SUF ¶¶ 1–2. "Crestor," a prescription drug used to reduce cholesterol, is the "most important" drug manufactured at IPR's plant. SUF ¶ 3. Arroyo was born in 1962, began working as a packaging operator for IPR in September 1987, and ended his employment in July 2015. SUF ¶¶ 4–5, 91–92. He has been diagnosed with depression. OSF ¶ 105. Arroyo initially received the company's employee handbook, and, later, received a revised copy of that handbook. SUF ¶¶ 27–29. During his employment at IPR, Arroyo had three immediate supervisors: he was supervised by Luis Rodriguez until 2011, Abraham Rodriguez ("Rodriguez") from 2011 to 2013, and Daniel Betancourt ("Betancourt") from 2013 until Arroyo's final day of employment. SUF ¶¶ 18–20. Evelyn Rivera ("Rivera") served as IPR's "Human Resources Lead," and Ralfy Calo ("Calo") was one of IPR's "top officers." SUF ¶ 80; OSF ¶¶ 83, 92.

### Arroyo's Positions at IPR

IPR promoted Arroyo to various positions within IPR's manufacturing department. SUF ¶ 7. In August 1998, Arroyo was promoted to the "Manufacturing Operator VI" position, the highest level of the manufacturing operator positions. SUF ¶¶ 11–13. This post allowed Arroyo to perform at all stages of the drug-manufacturing process (including dispensing, milling, compression, and coating) and to train other employees in various positions within that process. SUF ¶¶ 8–10. During this same time period, Arroyo was also designated a "Supervisor's Designated Operator," which allowed him to coordinate other employees' schedules, help IPR's supervisor meet manufacturing goals, authorize "certain procedures" in the manufacturing process, approve the start of the manufacturing process, and furnish the "final approval" required for that process. SUF ¶¶ 11–13.

From 2010 to 2013, Arroyo worked in the "Dry Mill Blend" area of IPR's manufacturing plant. SUF ¶ 14. In January 2014, Arroyo was transferred to the plant's "Dispensing I" area. SUF ¶ 14; OSF ¶ 14. According to Arroyo, when he was transferred

to this area, Betancourt told him, "Old man, I'm going to leave you here so you will retire." Docket No. 33-1 at 45. In May 2014, Arroyo was assigned to the plant's "Dispensing II" area "due to business needs."[3] SUF ¶¶ 15; 16; OSF ¶ 16. Before May 2014, Arroyo had, on certain occasions, been assigned to the plant's "Dispensing II" area, where he provided "backup" and aided in the area's "cleaning" procedures. SUF ¶ 17; OSF ¶ 17.

*Work Schedule*

Arroyo was paid on an hourly basis, labored for eight hours per day and 40 hours per week, and worked the shift running from 6:00 a.m. to 2:30 p.m. SUF ¶¶ 21–22. After approximately 2011, Arroyo was assigned an "earlier start time," though he remained scheduled to work an eight-hour workday. SUF ¶ 26. On occasion, Arroyo worked overtime or on weekends or would start his shift early to "accelerate production and meet production demands." SUF ¶¶ 23–25. IPR claims that Arroyo voluntarily and optionally worked overtime, weekends, or earlier than usual,[4] while Arroyo asserts that Betancourt demanded that he work beyond his regularly scheduled hours or start his shift early and that he made such requests on short notice. SUF ¶¶ 23–25; OSF ¶¶ 23–25.

*Discipline & Performance Evaluations*

Arroyo acknowledged that he was disciplined on various occasions for violating IPR's manufacturing procedures. SUF ¶ 60. Specifically, he was disciplined for failing to follow these procedures in 2010, as well as in September and December 2013. See SUF ¶¶ 60–66; OSF ¶¶ 64–66. Arroyo received annual performance evaluations, and these disciplinary measures appear to have affected those evaluations. SUF ¶ 34. For example, it is undisputed that, in 2009, Luis Rodriguez evaluated Arroyo's overall performance as exceeding expectations, while, in 2010, he found that Arroyo's overall performance only

---

[3] While OSF ¶ 16 purportedly "qualifies" SUF ¶ 16, the "qualification" is largely unrelated to the statement in SUF ¶ 16; OSF ¶ 16 states that Arroyo was insufficiently experienced to perform the job at the "Dispensing II" area. Additionally, OSF ¶ 16 does not challenge the notion that Arroyo was transferred to the "Dispensing II" area for legitimate business needs. *See* OSF ¶ 16.

[4] In this vein, Arroyo was "recognized" in 2010 for being disposed to work overtime and provide support to other areas of the manufacturing plant. SUF ¶ 39.

partially met expectations. SUF ¶¶ 36–37. In 2010, Arroyo violated IPR's manufacturing procedures. SUF ¶ 38. Arroyo's violations of IPR's standard procedures in 2010 compromised the quality of IPR's products, and so IPR asked Arroyo to improve his performance so that it complied with IPR's procedures. SUF ¶ 38. Both parties agree that due to the "highly-regulated nature of IPR's operations," it is imperative that IPR's employees comply with the manufacturing procedures, including the "standard operating procedures" and "good manufacturing practices." SUF ¶ 47; OSF ¶ 47. Arroyo and other employees were trained to follow these procedures, and Arroyo was informed that violating these procedures could lead to termination. SUF ¶¶ 48–51, 54–59. Arroyo's training included the procedures required for working in the "Dispensing II" area, though Arroyo felt insufficiently experienced to work there. SUF ¶¶ 52–53; OSF ¶¶ 14, 16, 52, 53.

In 2011 and 2012, Arroyo received "outstanding" performance ratings in his annual evaluations and so his salary was increased each year. SUF ¶¶ 41–42. But Betancourt found that Arroyo's performance required improvement in the 2013 evaluation—the lowest rating in that year's performance evaluation—because Arroyo engaged in various violations of the company's quality standards and procedures. SUF ¶ 45. This performance evaluation was discussed with Arroyo, and he did not receive a salary increase that year because an employee who receives a subpar performance evaluation is ineligible for such an increase. SUF ¶¶ 45–46.

### Suspension & Resignation

On June 30, 2014, Arroyo and Abdiel Irizarry ("Irizarry") were the only two manufacturing operators in charge of a particular batch of Crestor in the "Dispensing II" area of IPR's plant. SUF ¶¶ 67, 68, 72. Irizarry executed the dispensing process, and Arroyo observed and verified, with his initials, that Irizarry complied with the manufacturing order. SUF ¶¶ 70, 71, 73. At the end of the manufacturing process, a chemical test is conducted to ensure that the pharmaceuticals produced are safe for human consumption. SUF ¶ 74. A chemical test revealed that this particular batch of Crestor failed to meet the required

Arroyo-Flores v. IPR Pharmaceutical, Inc., Civil No. 15-1998 (BJM)                    6

specifications. SUF ¶ 75; OSF ¶ 75.[5] According to an investigation by Eric Rivera ("Eric Rivera"), who works in IPR's Quality Department, this batch of Crestor was botched due to the human error of the only two individuals who had access to the machine—Arroyo and Irizarry. SUF ¶¶ 75–77.

On the other hand, according to Irizarry's deposition testimony, the Crestor batch failed to meet the required specifications because the machine malfunctioned—saying that the "equipment . . . was running . . . inefficient[ly] from the time it was installed." Docket No. 33-4 at 6; OSF ¶¶ 75–77. According to Irizarry, "it was communicated" to Luis Rodriguez, Abraham Rodriguez, Betancourt, and Calo that the equipment "did not work properly." Docket No. 33-4 at 6. Notwithstanding, according to Irizarry, Betancourt asked Irizarry to continue working with the equipment. Docket No. 33-4 at 4–6.

Moreover, Irizarry's deposition testimony relayed that the machine would sound an "alarm" whenever something was awry in the manufacturing process, and that the machine did not do so for this particular batch of Crestor. OSF ¶ 67; Docket No. 33-4 at 4, 87, 105. Arroyo also provided a statement expressing that he "did not notice any type of inconvenience" during the process of manufacturing the Crestor batch. Docket No. 33-2. While the cause of the spoiled batch is in dispute, it is uncontested that this batch, in addition to two others, were unable to be used—resulting in a loss to IPR of over $315,000. SUF ¶ 78.

On July 21, 2014, Arroyo was interviewed in connection with the investigation of the noncompliant Crestor batch. SUF ¶ 79. Eric Rivera, Betancourt, and Rivera (IPR's "Human Resources Lead") were present at the interview. SUF ¶ 80. At that time, Arroyo was informed that the "Historical Trend Reports" revealed that some deviations during the dispensing of the lost Crestor batch caused its failure to meet the required specifications.

---

[5] While Arroyo claims that the machine producing this particular batch of Crestor did not indicate any issues while it was operating, this response does not "qualify," or speak to, SUF ¶ 75, which states that a *chemical test* revealed that the Crestor batch in question did not meet the required specifications. *See* OSF ¶ 75.

SUF ¶ 79. Arroyo was able to respond to Rivera's questions, and provided his version of the events that took place during the dispensing process. SUF ¶ 81. During this interview, Arroyo did not complain of being discriminated on account of his age or disability. SUF ¶ 83. After the interview, and while the investigation into the botched Crestor batch continued, Arroyo was suspended. SUF ¶ 84. It is unclear from the record who made the ultimate decision to suspend Arroyo, as well as who told Arroyo that he had been suspended. *See* SUF ¶ 84; Docket No. 21-2 at 5.

Two days later, Arroyo provided IPR's medical dispensary with a medical certificate stating that he was unable to work from July 23 to August 31, 2014, due to a disability. SUF ¶ 85; Docket No. 21-16. At this time, Arroyo was unaware of the "final result" of the investigation into the botched Crestor batch. SUF ¶ 86; Docket No. 21-2 at 116:14–17. Irizarry testified that after Arroyo was suspended, he met with Rivera on July 31, 2014. Docket No. 33-4 at 13. At that time, according to Irizarry, Rivera asked Irizarry to prepare a statement blaming Arroyo for the spoiled Crestor batch and intimated that he would be fired if he declined to do so. *Id.* at 20. According to Irizarry, Betancourt made this same request. *Id.* at 21.

Irizarry refused to prepare the statement blaming Arroyo for the ruined Crestor batch. *Id.* at 20, 26. On August 7, Betancourt handed Irizarry a termination letter and said "that since [he] did not write the statement for Willy, well, that they had to fire" him. *Id.* at 26. Counsel asked Irizarry at his deposition whether he knew the reason IPR sought the statement from him, and Irizarry testified that it was "for them to fire" Arroyo. *Id.* at 27. When counsel further asked Irizarry whether he knew the "reasons" why IPR would seek to do so, Irizarry responded that it was "because he was old and sick, because those were the comments that were heard" from the "supervisors," Betancourt in particular. *Id.* at 27.

After Arroyo's suspension and initial request for disability leave, Arroyo continued to provide IPR with medical certificates extending his disability leave until July 2015. SUF ¶ 87. These certificates were delivered to IPR by Arroyo's domestic partner. SUF ¶ 87. On

July 6, 2015, Arroyo tendered his letter of resignation. SUF ¶¶ 90, 91. This letter was accompanied by a medical certificate stating that Arroyo "suffers from an emotion condition" that "permanently" prevented him from returning to work. Docket No. 21-20 at 2; SUF ¶ 91. Three days later, Rivera accepted Arroyo's resignation. SUF ¶ 92.

### Complaints & Requests

When IPR accepted Arroyo's resignation on July 9, 2015, Rivera expressed that IPR had not received any complaints or reports of discrimination from Arroyo. SUF ¶ 92. But Arroyo underscores that he told Rivera in 2013 about statements made by Rodriguez, his former supervisor. OSF ¶¶ 92, 83. According to Arroyo, Rodriguez called him "old man" and "crazy man," and told him that he should "go get Social Security." OSF ¶¶ 92, 83; Docket No. 33-1 at 28, 30–31. And Rodriguez "on very few occasions" actually called Arroyo by his name, opting instead to address him by "old man," "crazy man," or "Willy." Docket No. 33-1 at 2. In response to this complaint, according to Arroyo, Rivera stated that the "procedure" and "culture had changed." Docket No. 33-1 at 32.

Arroyo also testified that he was subjected to similar comments by Betancourt. According to Arroyo, Betancourt called him "old man" and "crazy man." Docket No. 33-1 at 48. And Betancourt, too, would rarely address Arroyo by his actual name, instead calling him "old man," "crazy man," "stud," or "Willy." Docket No. 33-1 at 2–3. Betancourt also told Arroyo to "go get social security." Docket No. 33-1 at 36–37. Arroyo complained about the comments he found offensive to Calo, one of IPR's top officers, sometime in 2013 or 2014. OSF ¶¶ 92, 83. According to Arroyo, Calo provided a response that was similar to Rivera's, saying that "it had to be done because a production had to be done." Docket No. 33-1 at 33; OSF ¶¶ 92, 83. Aside from Betancourt and Rodriguez, Arroyo identified no other individuals whom he claims subjected him to harassing remarks. SUF ¶¶ 104; OSF ¶ 104.

Arroyo acknowledges that—within six months of his July 21, 2014 suspension—he did not file or threaten to file a judicial claim or administrative charge, participate in a

legislative investigation, or complain to IPR's human resources department about any discriminatory practice. SUF ¶¶ 106–107. It is also uncontested that, during the time he was employed by IPR, he was permitted to attend several appointments with his doctor and credit the time spent at the appointments as paid leave. SUF ¶¶ 93, 95. When Arroyo asked to be absent due to a doctor's appointment, he provided a medical certificate to IPR's medical dispensary. SUF ¶ 94. None of these certificates state that Arroyo had "any medical restrictions." SUF ¶ 95.

Arroyo did not request a reasonable accommodation due to being depressed or for any other medical condition. SUF ¶¶ 97–98. Rather, in 2013, Arroyo requested that he be assigned another work partner because (according to him) his work partner was not laboring diligently enough. SUF ¶¶ 99, 100. According to Arroyo, this situation required him to do more work and caused him much stress. SUF ¶¶ 99, 100; OSF ¶ 97. In addition to requesting a new work partner, Arroyo requested, in the alternative, that IPR transfer him to a different work area. OSF ¶¶ 97–101. Eventually, though not immediately, Arroyo was transferred to the "Dispensing II" area of IPR's plant. SUF ¶ 101; OSF ¶ 101. Arroyo commenced this action on July 23, 2015. Docket No. 1.

## DISCUSSION

IPR contends that summary judgment is appropriate as to the ADEA, ADA, and state-law claims. Docket Nos. 19, 35. Arroyo responds that summary-judgment adjudication is improper as to all his claims because they are riddled with genuine disputes of material fact. Docket No. 31, 41.

## I.    ADEA

The ADEA "provides that it is unlawful for an employer to 'refuse to hire or to discharge any individual or otherwise discriminate against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of such . . . individual's age.'" *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 137–38 (1st Cir. 2012) (quoting 29 U.S.C. § 623(a)(1)). Broadly speaking, this statute "protects persons

40 years old or older from age-based employment discrimination." *Martinez-Rivera v. Commonwealth of P.R.*, 812 F.3d 69, 78 (1st Cir. 2016). The First Circuit has "recognized hostile work environment claims under the ADEA," *Collazo v. Nicholson*, 535 F.3d 41, 44 (1st Cir. 2008), as well as ADEA-based retaliation claims. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991). Arroyo asserts that he was subjected to discriminatory adverse actions, retaliation, and harassment in violation of the ADEA.

### A.    Discrimination

To assert an ADEA discrimination claim, a plaintiff "has the burden of establishing 'that age was the 'but-for' cause of the employer's adverse action.'" *Acevedo-Parrilla*, 696 F.3d at 138 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). This showing does not require the plaintiff "to proffer direct evidence of discrimination," as a plaintiff "may meet his burden through circumstantial evidence." *Acevedo-Parrilla*, 696 F.3d at 138. "Where, as here, the employee lacks direct evidence," courts "utilize the burden-shifting framework developed by the Supreme Court to facilitate the process of proving discrimination."[6] *Cruz v. Bristol-Myers Squibb Co., P.R.*, 699 F.3d 563, 570 (1st Cir. 2012). This three-step burden-shifting framework was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

A prima facie case of age-based discrimination is established under the *McDonnell Douglas* burden-shifting framework by showing that (i) the employee "was at least 40; (ii) her work was sufficient to meet the employer's legitimate expectations; (iii) her employer took adverse action against her; and (iv) either younger persons were retained in the same position upon her termination or the employer did not treat age neutrally in taking the

---

[6] Arroyo does not contend that any of the evidence he has proffered qualifies as "direct evidence" of discrimination. *See, e.g.*, *Melendez-Arroyo v. Cutler-Hammer de P.R. Co.*, 273 F.3d 30, 35 (1st Cir. 2001) (direct evidence "normally contemplates only those statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision") (internal quotations omitted). And because both parties have proceeded under the Supreme Court's *McDonnell Douglas* burden-shifting framework in arguing for their respective positions, Arroyo's claims will be evaluated under that framework.

adverse action." *Del Valle-Santana v. Servicios Legales de P.R., Inc.*, 804 F.3d 127, 129–30 (1st Cir. 2015). "This showing gives rise to an inference that the employer discriminated due to the plaintiff's advanced years." *Mesnick*, 950 F.2d at 823.

After the plaintiff has shown a prima facie case of discrimination, the burden shifts to the defendant-employer to articulate "a legitimate, nondiscriminatory reason for the adverse employment decision." *Id.* "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." *Id.* If the employer satisfies this burden, "the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." *Gómez–González v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010) (internal quotation mark omitted). "At the summary judgment stage, the plaintiff need not prove his case, but must proffer sufficient evidence to raise a genuine issue of material fact as to whether he" suffered an adverse action "because of his age." *Adamson v. Walgreens Co.*, 750 F.3d 73, 78–79 (1st Cir. 2014) (citing *Domínguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000)).

### 1.      Age & Qualifications

In this case, IPR concedes Arroyo was over 40 during the relevant events. Docket No. 19 at 6. But IPR contends that Arroyo failed to meet IPR's "legitimate expectations." A plaintiff's "burden under the 'qualified' prong of the prima facie case . . . is met if he presents 'evidence which, if believed, prove[s] that he was doing his chores proficiently.'" *Acevedo-Parrilla*, 696 F.3d at 139; *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir. 1988) ("qualifications" prong met notwithstanding "defendant's adamantine insistence that plaintiff's job performance was not up to snuff"). When evaluating whether the employee has met the employer's legitimate expectations, the court does not consider the employer's proffered reason for imposing the adverse employment action. *See Melendez v. Autogermana, Inc.*, 622 F.3d 46, 51 (1st Cir. 2010) ("we cannot rely on

Meléndez's poor sales performance," which allegedly led to his dismissal, "in assessing whether he satisfied the legitimate expectations prong of the *prima facie* case").

Here, IPR highlights that Arroyo received negative performance reviews in 2010 and 2013. But Arroyo counters that he met IPR's legitimate expectations because he received stellar performance reviews and salary increases in 2011 and 2012. Additionally, Arroyo worked at IPR for over 20 years, he was promoted to the highest manufacturing operator position (Manufacturing Operator VI), he was named a "Supervisor's Designated Operator," he was qualified to train other employees, and he had been "recognized" in 2010 for his disposition to work overtime and provide support to other areas of IPR's plant. Construing the conflicting record evidence in the light most favorable to Arroyo, a reasonable jury could surely find that he met IPR's legitimate expectations. *See Acevedo-Parrilla*, 696 F.3d at 139 (employee met this prong where he was a "trained mechanical engineer with prior, well-rated experience in the manufacturing and pharmaceutical sectors, including experience as a supervisor," and "had a long history of employment at the company, spanning an eleven-year period, with overall positive reviews"). Thus, a reasonable jury could find for Arroyo as to the first two elements of his ADEA claim.

## 2.      Adverse Employment Action

To establish the third element of an ADEA discrimination claim, Arroyo asserts that he suffered four adverse employment actions: (1) a suspension, (2) a change to his work shift that required him to start working earlier in the day, (3) a transfer from the "Dry Mill" area of IPR's plant to the "Dispensing I" area, and (4) a constructive discharge. "An adverse employment action typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012) (internal quotation marks omitted). A suspension is surely an adverse employment action, and IPR wisely does not contend otherwise. *See, e.g.*, *Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co.*, 152 F.3d 17, 26

(1st Cir. 1998) ("there is no doubt that, at 54 years of age, Alvarez fell within the category of persons protected by the Act, and that he was subjected to adverse employment action, namely, suspension and termination"). On the other hand, IPR contends that the three other alleged adverse employment actions lack merit.

IPR contends that the change in Arroyo's work schedule, which required him to start his eight-hour shift earlier in the day, was not an adverse employment action. A "lateral transfer or shift change 'that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.'" *Aguirre v. Mayaguez Resort & Casino, Inc.*, 59 F. Supp. 3d 340, 352 (D.P.R. 2014) (quoting *Marrero v. Goya of P.R.*, Inc., 304 F.3d 7, 23 (1st Cir. 2002)); *Cham*, 685 F.3d at 95 (minor reduction in work hours did "not rise to the level of an adverse employment action in the context of a workplace where schedules fluctuate and no employee is entitled to any given shift"); *Arredondo v. Flores*, Civil Action No. L–05–191, 2008 WL 4450311, *6 (S.D. Tex. Sept. 30, 2008) ("Even if" the standard used in the anti-retaliation context "applies, a change in schedule, shift, and days off . . . is insufficient to establish an adverse employment action"). Because Arroyo was not "entitled to any given shift," *see Cham*, 685 F.3d at 95, the schedule change in this case—standing alone—does not qualify as an adverse employment action. *See Aguirre*, 59 F. Supp. 3d at 352.

IPR next contends that Arroyo's transfer from the "Dry Mill" area of the plant to the "Dispensing I" area is insufficient to qualify as an adverse employment action. An adverse employment action may be established by showing "disadvantageous transfers or assignments." *Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998). But "a transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action." *Marrero*, 304 F.3d at 23. To prove that "the transfer was materially adverse," an employee must show that the employer "took something of consequence from [him], say, by . . . reducing h[is] salary, or divesting h[im] of significant responsibilities.'" *Id.* (internal quotations omitted).

Importantly, before a court can "conclude that the transfer was, in substance, a demotion," the employee has the burden of showing a "tangible change in duties or working conditions." *Marrero*, 304 F.3d at 23. This showing generally requires the employee to come "forward with enough objective evidence *contrasting* her former and current jobs" so as "to allow the jury to find a materially adverse employment action." *See Billings v. Town of Grafton*, 515 F.3d 39, 53 (1st Cir. 2008) (emphasis added).

In this case, Arroyo failed to meet his burden of proffering enough objective evidence that would allow the court to *contrast* his job duties or working conditions in the "Dry Mill" area with his job duties or working conditions in the "Dispensing I" area. *See Billings*, 515 F.3d at 53; *Marrero*, 304 F.3d at 23. Indeed, though there is evidence relating to the duties Arroyo was required to perform in the "Dispensing I" area, Arroyo has not pointed the court to any evidence identifying his duties or working conditions in the "Dry Mill" area. And while Arroyo highlights that he loaded cargo in the "Dispensing I" area, not much can be inferred from this evidence because it is uncontested that he performed similarly arduous tasks, like helping with the required "cleaning" procedures, in other areas of IPR's plant. See SUF ¶ 17; OSF ¶ 17. Thus, because Arroyo failed to come forward with sufficient objective evidence contrasting his pre- and post-transfer job duties or working conditions, a reasonable jury could not find—based on the current state of the evidentiary record—that Arroyo suffered a materially adverse employment action when he was transferred from the "Dry Mill" area to the "Dispensing I" area. *See Billings*, 515 F.3d at 53; *Marrero*, 304 F.3d at 23; *Forsyth v. City of Dall.*, 91 F.3d 769, 774 (5th Cir. 1996) ("a plaintiff's subjective perception that a demotion has occurred is not enough").

The next alleged adverse employment action fares no better than the previous two. While IPR does not dispute that "a constructive discharge can constitute an adverse employment action under the ADEA," *Jorge v. Rumsfeld*, 404 F.3d 556, 562 (1st Cir. 2005), the company argues that a reasonable jury could not find that Arroyo was constructively discharged under the circumstances of this case. Broadly speaking, a "constructive

discharge" ordinarily "refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." *Lee–Crespo v. Schering–Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003) (internal quotation marks and citation omitted). "To prove constructive discharge, a plaintiff must usually 'show that her working conditions were so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign.'" *De La Vega v. San Juan Star, Inc.*, 377 F.3d 111, 117 (1st Cir. 2004) (citation omitted).

This standard is not met by merely showing "the plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *De La Vega*, 377 F.3d at 117 (citation omitted). Instead, "an employee 'must show that, *at the time of his resignation*, his employer did not allow him the opportunity to make a free choice regarding his employment relationship.'" *Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008) (emphasis added) (quoting *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004)). Accordingly, "in order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will." *Torrech-Hernandez*, 519 F.3d at 50; *see also Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993) (constructive discharge exists where employer's actions "effectively vitiate the employees' power to choose work over retirement").

In this case, Arroyo tendered his letter of resignation on July 6, 2015, and IPR accepted that resignation three days later. It is uncontested that Arroyo's absence from the workplace was initially due to the July 21, 2014 suspension, and that, after July 23, 2014, the absence was due to Arroyo's requests for disability leave. IPR also underscores—without opposition from Arroyo—that all the alleged incidents of harassment and discrimination predate the end of July 2014. The First Circuit has repeatedly held that if "'a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged.'" *Gerald v. Univ. of P.R.*, 707 F.3d 7, 26 (1st Cir. 2013) (quoting *Landrau–Romero v. Banco Popular de P.R.*, 212 F.3d 607, 613 (1st Cir.

2000) (seven-month period between harassing acts and resignation was found to be too long to support a constructive discharge theory)); *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991) (six-month period too great for a constructive discharge theory).

*Gerald* aptly illustrates the proper result here. 707 F.3d at 26. In that case, the employee resigned "a little over a year after the final act of harassment and eight months after she was transferred to" a different facility's laboratory—an employment action the employee claimed was a "demotion." *Id.* Under these circumstances, the First Circuit held that the "resignation came too late after the offensive conduct and reassignment to be labeled a constructive discharge." *Id.* As in *Gerald*, Arroyo's constructive discharge theory lacks merit because, when he resigned in July 2015, over a year had transpired since the occurrence of all the alleged incidents of harassment and discrimination. *See id.* Thus, Arroyo's constructive discharge theory lacks merit. In light of the foregoing, Arroyo's suspension is the only adverse employment action that may go forward.

### 3.    Causation

The final element of Arroyo's prima facie case requires him to show that IPR "did not treat age neutrally in taking the adverse action." *Del Valle-Santana*, 804 F.3d at 129–30. And this requires an employee to establish "'that age was the 'but-for' cause of the employer's adverse action.'" *Acevedo-Parrilla*, 696 F.3d at 138 (quoting *Gross*, 557 U.S. at 177). In evaluating causation, courts consider "actions taken against the employee within the overall context and sequence of events, the historical background of the decision, any departures from normal procedure, and contempor[aneous] statements by the employer's decision makers." *Del Pilar Salgado v. Abbott Labs.*, 520 F. Supp. 2d 279, 292 (D.P.R. 2007) (citing *Vargas v. Puerto Rican–American Ins. Co.*, 52 F. Supp. 2d 305, 313–14 (D.P.R. 1999)). And though "stray workplace remarks . . . normally are insufficient, standing alone, to establish . . . the requisite discriminatory animus," *González v. El Día, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002), such remarks "may properly constitute evidence of

discriminatory intent for the jury to consider in combination with other evidence." *Velazquez-Garcia v. Horizon Lines of P.R., Inc.*, 473 F.3d 11, 18 (1st Cir. 2007).

In this case, Arroyo underscores statements by IPR's decision makers and an anomalous departure in IPR's investigation of the botched Crestor batch. The First Circuit has held that courts may consider "discriminatory comments . . . made by the key decisionmaker or those in a position to influence the decisionmaker." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000). Arroyo highlights that Betancourt, his immediate supervisor, referred to him as "old man" and rarely called him by his actual name. Additionally, Arroyo testified that Betancourt made statements to the effect that Arroyo should "retire" and go "get social security."

After considering Betancourt's statements, a reasonable jury could certainly infer discriminatory animus. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 171 (1st Cir. 1998) ("Statements by supervisors carrying the inference [of] . . . animus against protected classes of people or conduct are clearly probative . . . even if that inference is not the only one that could be drawn from the comment") (emphasis added) (citations omitted); *see also Hale v. ABF Freight System, Inc.*, 503 F. App'x. 323 (6th Cir. 2012) (genuine dispute of material fact as to age-based animus where supervisor was overheard saying, "[Plaintiff] is going to leave here when he is 62. I am going to see it. He has been here long enough, and he is going to go on his social security"); *Houston v. Kirkland*, No. GJH-15-2507, 2016 WL 7176580, at *10 (D. Md. Dec. 7, 2016) (reasonable jury could infer age-based animus where employer told employee that he was "old enough to collect social security").

And though it is unclear who made the ultimate decision to suspend Arroyo, the record evidence would support a causal connection even if Rivera, rather than Betancourt, made the ultimate decision.[7] Indeed, because Betancourt participated in the meeting that shortly preceded the decision to suspend Arroyo, a reasonable jury could consider his

---

[7] Of course, if Betancourt made the decision to suspend Arroyo, as appears to have been the case with Irizarry's termination, this fact would serve to strengthen Arroyo's prima facie case.

statements because he was, at the very least, "in a position to influence the decisionmaker." *Santiago-Ramos*, 217 F.3d at 55; *see also Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003) ("Age-related remarks are appropriately taken into account" in the evidentiary calculus, "even where the comment is not in the direct context of the" adverse action "and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision"). These circumstances would also allow a reasonable jury to find that the statements were causally and temporally related to the decision to suspend Arroyo. *See Walton v. Nalco Chem. Co.*, 272 F.3d 13, 25 (1st Cir. 2001) (decision maker's remark made sometime in 1997 was "directly related and temporally proximate" to termination occurring in February 1998); *see also infra* Pt. I.A.4.

Second, Arroyo points to an anomalous departure during the investigation of the spoiled Crestor batch. At the outset, it should be noted that, when viewed in the light most favorable to Arroyo, the record evidence suggests that he was suspended before IPR had the full results of the investigation available. In this vein, IPR readily acknowledges that Arroyo was suspended "pending an investigation." Docket No. 19 at 12. And once that investigation was underway, Arroyo relies on Irizarry's deposition testimony to show that Betancourt—one of IPR's decision makers—harbored age-based discriminatory animus.

In support of this theory, Arroyo underscores that Betancourt and Rivera asked Irizarry to prepare a statement blaming Arroyo for the ruined Crestor batch. And when counsel asked Irizarry at his deposition whether he knew the reason IPR wanted him to prepare such a statement, he testified that Betancourt and Rivera were looking for a reason to fire Arroyo because he was "old and sick." And Irizarry arrived at this conclusion "because those were the comments that were heard" from the "supervisors"—Betancourt in particular. Construing the record evidence in the light most favorable to Arroyo, I find that a reasonable jury could consider Betancourt's age-related remarks, the sequence of events leading up to Arroyo's suspension, and the evidence of an anomalous departure in the internal investigation to find the requisite causal connection. Thus, Arroyo has proffered

sufficient evidence to establish a prima facie case of age-based discrimination arising from his suspension.

### 4.        Legitimate, Nondiscriminatory Reason & Pretext

IPR contends that Arroyo was suspended for a legitimate, nondiscriminatory reason: "the result of an investigation" conducted by one of IPR's employees revealed that the Crestor batch was ruined due to the error of the only two operators who had access to the machine—Arroyo and Irizarry. Docket No. 35 at 9. This is surely a legitimate, nondiscriminatory reason that satisfies IPR's burden of production. *See, e.g.*, *Acevedo-Parrilla*, 696 F.3d at 140 (employer proffered legitimate, nondiscriminatory reason for firing employee by claiming that this action was based on "investigate reports" showing that the employee "failed to comply with the duties and objectives of his position" and that these failures "had a negative impact on the plant's operations"). IPR having proffered a legitimate, nondiscriminatory reason for Arroyo's suspension, the spotlight returns to Arroyo, who must show that this reason is a pretext for age-based discrimination.

In this third and final stage of the burden-shifting framework, "the *McDonnell Douglas* framework falls by the wayside," *Mesnick*, 950 F.2d at 824, and the court's focus turns to the "ultimate issue": whether, after assessing all the record evidence in the light most favorable to Arroyo, he has raised a genuine dispute of material fact as to whether his suspension was on account of discriminatory animus. *See Acevedo-Parrilla*, 696 F.3d at 140. To meet this burden, Arroyo "must offer some *minimally sufficient* evidence, direct or indirect, both of pretext and of [IPR's] discriminatory animus." *Mesnick*, 950 F.2d at 825 (emphasis added); *see also Santiago–Ramos*, 217 F.3d at 54 ("courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent"). In making this showing, an employee may proffer the "same evidence" to "show both that the employer's articulated reason . . . is a pretext and that the true reason is discriminatory." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56–57 (1st Cir. 1999); *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) ("although the

presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual'") (internal citation omitted).

An employee may bring to the fore "comments by the employer which intimate a [discriminatory] mindset," *Mesnick*, 950 F.2d at 828, as well as "different and arguably inconsistent explanations" for the employer's actions. *Domínguez–Cruz*, 202 F.3d at 432. "'[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in the employer's proffered reason can also "do the trick." *Collazo-Rosado v. Univ. of P.R.*, 765 F.3d 86, 93 (1st Cir. 2014). But pretext is not established by merely impugning the veracity of the employer's proffered reason or by showing that the employer's perception was incorrect. *See Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014) (to show pretext, it is insufficient for "a plaintiff to 'impugn the veracity' of the employer's proffered reason"); *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 177 (1st Cir. 2008) ("If there is no proof of discriminatory animus on the part of a decisionmaker, a plaintiff must show more than that the decisionmaker's perception was incorrect"); *Mesnick*, 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merits-or even rationality-of employers' nondiscriminatory business decisions.").

In this case, Arroyo seeks to establish pretext by relying upon the same evidence he used to establish his prima facie case. *See Reeves*, 530 U.S. at 143; *Thomas*, 183 F.3d at 56–57. This evidence meets the "minimally sufficient evidence" standard because it would allow, though not necessarily compel, a reasonable jury to infer that Arroyo's suspension was driven by discriminatory animus and that the result of the internal investigation was not the actual reason for the suspension. *See Mesnick*, 950 F.2d at 825. To begin with, there is arguably an inconsistency and incoherency with IPR's proffered reason. *See Collazo-Rosado*, 765 F.3d at 93. IPR claims that Arroyo was "suspended from his employment" due to "the *result* of an [internal] investigation." Docket No. 35 at 9 (emphasis added).

But, on the other hand, IPR has also claimed that Arroyo was suspended sometime before the internal investigation had actually concluded—representing that "Arroyo was suspended on July 21, 2014 while the investigation related to the deviation in [the spoiled Crestor] batch was conducted," SUF ¶ 84, and claiming that Arroyo has failed to show that IPR's proffered reason "for suspending him *pending an investigation* was actually a pretext." Docket No. 35 at 9 (emphasis added); *see also* Docket No. 19 at 8 (Arroyo "was suspended . . . pending an investigation"). While there might be some reasonable explanation for this inconsistency and incoherency, none was proffered and a reasonable jury could surely consider this quagmire in the evidentiary record when evaluating whether IPR's proffered reason is pretextual.[8]

Arroyo has also underscored statements by IPR's decision makers that reflect a discriminatory animus. For example, Arroyo testified that Betancourt mostly called him "old man" rather than his actual name, and that Betancourt intimated that Arroyo should "retire" and "go collect social security." Irizarry corroborated Arroyo's account, testifying that "supervisors" made comments of this nature, particularly Betancourt. And Arroyo testified that he complained about these type of comments to Rivera in 2013 and to Calo in 2014. Because these remarks were being made as late as 2014, a reasonable jury could infer that Betancourt's statements "were temporally and causally related to" his July 21, 2014 suspension. *See Acevedo-Parrilla*, 696 F.3d at 144 (reasonable jury could consider remarks by decision maker revealing age-based animus where the remarks "were made, at most, six months prior to" the adverse employment action); *see also Walton*, 272 F.3d at 25 (decision maker's remark made sometime in 1997 was "directly related and temporally proximate" to termination occurring in February 1998).

Arroyo has also proffered evidence that would allow a reasonable jury to cast doubt on whether the "result" of the internal investigation was the true reason for his suspension.

---

[8] In this vein, I note that neither IPR's statement of uncontested facts nor Arroyo's opposing statement of facts reveals the precise point at which IPR's internal investigation concluded.

Notably, and as discussed above, it is unclear whether the investigation had actually concluded as of July 21, 2014. A reasonable jury could thus very well question whether Rivera (or, possibly, Betancourt) had the result of the internal investigation available to her at the time she decided to suspend Arroyo.[9] Indeed, IPR's statement of facts suggests that the result of the internal investigation was not available at the time of Arroyo's suspension, saying that Arroyo was suspended "while the investigation . . . was conducted." SUF ¶ 84. The latter reading of the record is consistent with the evidence Arroyo proffers. Arroyo relies on Irizarry's deposition testimony to show that IPR's decision makers asked him— during a meeting on July 31, 2014—to prepare a statement blaming Arroyo for the botched Crestor batch.

As Arroyo highlights, a reasonable jury also could rely on Irizarry's testimony to cast doubt on IPR's proffered reason. *See Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir. 2000) ("[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination"); *Acevedo-Parrilla*, 696 F.3d at 141 (in case where mechanical engineer was dismissed from pharmaceutical company due to four incidents of alleged malfeasance at the company's plant, First Circuit reasoned that the "fact that there is uncertainty regarding whether Acevedo was responsible for the pointed-to incidents indicates that there is a question for a jury to resolve as to whether the employer did in fact rely on these incidents in making its termination decision"). Irizarry relayed that IPR asked him to blame Arroyo for the botched Crestor batch, and that he refused to do so because he believed that IPR's equipment was operating inefficiently and that such equipment malfunction was the cause

---

[9] In this vein, I note that it is questionable whether the court would be able to consider evidence of the product of an investigation that concluded after the decision to suspend Arroyo had already been made. *See Baylor v. Jefferson Cnty. Bd. of Educ.*, 733 F.2d 1527, 1533 (11th Cir. 1984) (district court correctly ruled that employer's "burden of articulating a legitimate, non-discriminatory reason for its employment decision could not be met by proffering the product of an investigation conducted by the Board after the decision to [impose the adverse action] was made"). Because it is not entirely clear whether those are the circumstances of the case before the court, this evidentiary issue need not be further explored at this particular juncture.

of the botched batch. In this vein, Irizarry testified that he had relayed to IPR's decision makers that the machines were malfunctioning. Arroyo also provided a statement expressing that nothing went awry during the manufacturing of the Crestor batch in question.

A reasonable jury could use this evidence to find pretext, and, moreover, question the need to secure Irizarry's assignment of blame if, in fact, the internal investigation had already revealed that the Crestor batch was ruined due to human error. A jury could also question why IPR would seek to blame Arroyo when, according to IPR's statement of facts, Arroyo was tasked with *observing* Irizarry as the latter individual operated the machine. What is more, a reasonable jury could find evidence of discriminatory animus because Irizarry testified that Betancourt made comments suggesting IPR sought to fire Arroyo for being "old and sick." And Arroyo has also testified that Betancourt made age-related remarks.

Relying on the evidence above, Arroyo seeks to survive summary judgment to tell the following narrative: that IPR knew its machines were not working properly, that IPR did not entirely believe that the botched Crestor batch was due to human error, and that IPR sought to oust Arroyo, by pinning on him the spoiled Crestor batch, on account of his advanced age. While IPR claims that "objective" and "unbiased" evidence would lead any reasonable jury to find that Arroyo's suspension was justified, Arroyo has proffered enough evidence to raise a genuine dispute of material fact as to this issue. Summary judgment is denied as to the ADEA discrimination claim arising from Arroyo's suspension.

### B.    Retaliation

An ADEA retaliation claim does not depend on the success of an ADEA discrimination claim. *See Mesnick*, 950 F.2d at 827. "Absent direct evidence, the *McDonnell Douglas* burden-shifting framework remains the option of choice in retaliation cases, albeit with slight modifications." *Id.* "Under the applicable model, the plaintiff must make a prima facie showing that (i) he engaged in ADEA-protected conduct, (ii) he was

thereafter subjected to an adverse employment action, and (iii) a causal connection existed between the protected conduct and the adverse action." *Id.* If the employee succeeds in establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its action. *See id.* If the employer does so, "the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation for the employee's opposition to a practice cast into doubt by the ADEA." *Id.*

### 1.        Protected Conduct

The ADEA provides, in relevant part, that it "shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). Protected conduct "refers to action taken to protest or oppose statutorily prohibited discrimination," *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (internal quotation marks omitted). Such protected conduct "includes 'the filing of formal charges of discrimination' as well as 'informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015) (quoting *Fantini*, 557 F.3d at 32).

In this case, Arroyo expressly admitted that, within six months of his July 21, 2014 suspension, he did not complain of any discriminatory practice to IPR's human resources department or IPR's management, or file any type of discrimination charge with a government agency. SUF ¶ 107. On the other hand, Arroyo testified that sometime in 2013 he complained to Rivera, who works in IPR's human resources department, about age-related comments. Docket No. 33-1 at 30. He also testified that he complained about these type of comments to Calo sometime in 2014. These informal protests of discrimination

surely constitute protected conduct under the ADEA's broad anti-retaliation provision. *See Planadeball*, 793 F.3d at 175. Thus, a reasonable jury could find that Arroyo engaged in protected conduct in 2013 and 2014.[10]

### 2.        Materially Adverse Action

To show that he was harmed by the alleged retaliatory conduct, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted); *Gomez-Perez v. Potter*, 452 F. App'x 3, 8 (1st Cir. 2011) (*Burlington Northern* standard applied to ADEA retaliation claim). "This is an objective test and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 472 (1st Cir. 2010) (quoting *Burlington N.*, 548 U.S. at 71). A materially adverse action may "include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Here, Arroyo largely complains of the same adverse actions that were proffered in the context of his ADEA discrimination claim. These actions include a suspension, a change in Arroyo's work schedule, a transfer from the "Dry Mill" area to the "Dispensing I" area, and a constructive discharge. Arroyo's July 21, 2014 suspension is surely a materially adverse action that satisfies the *Burlington Northern* standard. *See Ramsdell v.*

---

[10] While Arroyo suggests that he engaged in conduct protected by the ADEA by requesting a "reasonable accommodation," this argument is misplaced because "the ADEA does not allow for 'reasonable accommodation.'" *See, e.g.*, *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 893 (7th Cir. 2005).

*Huhtamaki, Inc.*, 992 F. Supp. 2d 1, 16 (D. Me. 2014) ("suspension . . . qualifies as the type of action that would dissuade a reasonable employee from reporting violations").

But the other three alleged adverse actions lack merit, largely for the same reasons discussed above. The First Circuit has held that in "appropriate circumstances . . . a schedule change may operate to dissuade a reasonable employee from reporting workplace discrimination." *Morales-Vallellanes v. Potter*, 605 F.3d 27, 39 (1st Cir. 2010). In *Potter*, the court held that a schedule change did not inflict a materially adverse action where the employee, who was not given his preferred schedule, failed to come forward with evidence showing that the schedule change affected him more than others, or that the schedule change imposed an undue hardship on him. *See id.* As in *Potter*, Arroyo complains of the schedule change without pointing the court to specific evidence showing that the schedule change affected him more than anyone else whose usual schedule is altered. *See id.* Thus, Arroyo failed to establish that his schedule change rose to the level of a materially adverse action under the *Burlington Northern* standard.

Arroyo also did not carry his burden of showing that the transfer could be considered a materially adverse action because he failed to proffer sufficient objective evidence that would allow the court to contrast his pre- and post-transfer job duties or working conditions. *Cf. Billings*, 515 F.3d at 53 (court found that employee "came forward with enough objective evidence contrasting her former and current jobs to allow the jury to find a materially adverse employment action" under the standard of *Burlington Northern*); *see also Potter*, 605 F.3d at 40 n.17 (citing *Aryain v. Wal–Mart Stores Texas LP*, 534 F.3d 473, 485 (5th Cir. 2008), for the proposition that "negative treatment, undesired transfer to another department, undesirable break schedule, and assignment of more arduous and dirty jobs are not adverse employment actions in the retaliation context"). And because Arroyo failed to resign within a reasonable time of the alleged harassment and discriminatory conduct, his constructive discharge theory also lacks merit. *See, e.g.,*

*Gerald*, 707 F.3d at 26. Thus, Arroyo's suspension is the only of the four alleged materially adverse employment actions that may proceed to the next step of the retaliation analysis.

### 3.    Causation

To establish causation, an employee has the burden of showing a "causal connection between" the materially adverse employment action and the "protected activity." *See, e.g.*, *Billings*, 515 F.3d at 55. An employee may rely on the mere temporal proximity between the protected conduct and the materially adverse action when that proximity is "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citation omitted). A time period of two months or less has been held sufficient to sustain the plaintiff's prima facie burden, while "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity." *See Calero-Cerezo*, 355 F.3d at 25.

Here, Arroyo engaged in protected conduct sometime in 2013 and 2014. He has expressly admitted, though, that he did not make any complaints of discrimination within six months of his suspension, which occurred on July 21, 2014. Accordingly, even though Arroyo engaged in protected conduct, this protected activity is too temporally remote from his suspension to allow an inference of retaliatory animus. *See Calero-Cerezo*, 355 F.3d at 25. And, unlike for his ADEA discrimination claim, Arroyo does not point to remarks by decision makers evincing a *retaliatory* animus, or any other indirect evidence that would buttress the causal connection required to establish this claim. Thus, the ADEA retaliation claim is dismissed.

### C.    Hostile Work Environment

The First Circuit has recognized the availability of hostile work environment claims arising under the ADEA. *Rivera-Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 24 (1st Cir. 2001). To establish a hostile work environment, a plaintiff must show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [his] employment and create an abusive working environment." *Quiles–Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir.

2006). When assessing whether a workplace is a hostile environment, courts look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with the employee's work performance. *See id.*

Here, Arroyo complains that Betancourt and Rodriguez called him "old man" and told him to "go get social security." But courts have held that these type of comments are insufficiently "severe" to establish a harassment claim. *See Rickard v. Swedish Match N. Am., Inc.*, 773 F.3d 181, 183, 185 (8th Cir. 2014) (supervisor's remarks about plaintiff's age—such as "you know, old man, you have a lot of years in"— were "not severe enough to be actionable," "even if" the comments were "intentionally disparaging"); *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 443 (5th Cir. 2012) (employee's ADEA harassment claim failed where "coworkers called him names like 'old man,' 'old fart,' 'pops,' and 'grandpa'"); *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 45 (1st Cir. 2011) (court did not find actionable harassment claim where coworkers told employee "on several occasions to get on social security"); *Rodriguez-Torres v. Gov't Dev. Bank of P.R.*, 704 F. Supp. 2d 81, 102 (D.P.R. 2010).

And while Arroyo testified that he was called by his actual name on "very few occasions," he also readily acknowledged at his deposition that his supervisors also called him either "Willy" (a diminutive of the name William from which no age-based animus can be inferred) or "stud." Docket No. 33-1 at 2. Because courts have rejected hostile work environment claims in cases where the alleged remarks were made on a much more frequent basis, Arroyo has also failed to establish that he was subjected to a "pervasive" age-based hostile work environment. *See Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 228 (D.D.C. 2015) (ADEA harassment claim not found severe or pervasive where employee asserted that supervisor called him "old man" "frequently" or "a lot of times"); *Marrero v. Schindler Elevator Corp.*, 494 F. Supp. 2d 102, 110 (D.P.R. 2007) (ADEA harassment claim not found where employee was called "viejo," "viejito," and "viejo pendejo" "on a

daily basis[ ]"). Thus, summary judgment is granted as to Arroyo's ADEA hostile work environment claim.

## II.    ADA

Arroyo asserts that IPR discriminated against him by failing to provide a reasonable accommodation and by imposing adverse employment actions because of his depression. He also claims that IPR retaliated against him by engaging in conduct protected by the ADA, and that he was subjected to a disability-based hostile work environment.

### A.    Discrimination—Failure to Accommodate

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the statute, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such entity." *Id.* § 12112(b)(5)(A).

To assert a claim under the ADA for failure to provide a reasonable accommodation, a plaintiff must establish that: (1) he suffered from a "disability" within the meaning of the statute; (2) he was a qualified individual in that she was able to perform the essential functions of her job, either with or without a reasonable accommodation; and (3) despite her employer's knowledge of her disability, the employer did not offer a reasonable accommodation for the disability. *Calero-Cerezo*, 355 F.3d at 19–20. The plaintiff bears the burden of showing a reasonable accommodation, and the defendant bears the burden of showing undue hardship. *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001).

Relatedly, because "an employee's disability and concomitant need for accommodation are often not known to the employer until the employee requests an

accommodation, the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request' from the employee." *Id.* at 260–61. This request "must be 'sufficiently direct and specific,' giving notice that she needs a 'special accommodation.'" *Id.* (quoting *Wynne v. Tufts Univ.*, 976 F.2d 791, 795 (1st Cir. 1992)). "At the least, the request must explain how the accommodation requested is linked to some disability. The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace." *Reed*, 244 F.3d at 261.

The foregoing rule is particularly pertinent where, as here, the employee claims the employer failed to reasonably accommodate a mental disability. As the Eighth Circuit has explained, where "the disability, resulting limitations, and necessary reasonable accommodations . . . are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, *the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.*" *Wallin v. Minnesota Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998) (emphasis in original) (internal quotation marks and citation omitted). Consistent with this rule, the court in *Rask v. Fresenius Medical Care North America*, 509 F.3d 466, 470 (8th Cir. 2007), held that an employee who suffered from depression could not maintain a failure-to-accommodate claim because she "did not inform" her employer "of the specific limitations that her depression" engendered. *Id.* And the employer "had no duty to find an accommodation for" the employee under these circumstances. *Id.*

In this case, Arroyo contends that he suffers from a disability because of his diagnosed depression. But even assuming that is so, IPR contends that Arroyo's failure-to-accommodate claim lacks merit because he failed to put the company on notice as to his disability and the accommodations that could have been provided in light of his medical restrictions. While Arroyo proffers evidence that he complained of being "stressed" and "overworked," he does not suggest—and does not proffer any evidence to show—that he ever told his supervisors or IPR's management that he needed a reasonable accommodation

on account of his diagnosis of depression. *See* SUF ¶¶ 97–98; OSF ¶¶ 97–98. Because Arroyo failed to do so, IPR was not required "to divine the need for a special accommodation" in light of what reasonably appeared to be a "mundane request for a change at the workplace." *Reed*, 244 F.3d at 261.

What is more, Arroyo has also readily admitted that the medical certificates he provided to IPR did not state that he "had any medical restrictions." SUF ¶ 95. Nor is there any evidence that Arroyo ever relayed his medical restrictions to IPR's managers via some other means. This being the case, as in *Rask*, where the employee's failure-to-accommodate claim lacked merit because she never informed the employer about the medical restrictions engendered by her depression, Arroyo's claim must fail because he has pointed to no evidence that he ever informed his supervisors about any medical restrictions engendered by his diagnosed depression. *See Rask*, 509 F.3d at 470. Thus, summary judgment is granted as to Arroyo's ADA failure-to-accommodate claim.

### B.     Discrimination—Adverse Employment Actions

In addition to arguing that IPR failed to accommodate his disability, Arroyo also contends that IPR subjected him to adverse employment actions because of his disability. To establish an ADA claim arising from an adverse employment action, an employee must show that "(1) she was disabled within the meaning of the ADA, (2) she was qualified to perform the essential functions of her job, either with or without reasonable accommodations, and (3) her employer took adverse action against her because of her disability." *Sanchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213 (1st Cir. 2008) (citing *Bailey v. Georgia–Pacific Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002)). If the employee establishes a prima facie case of discrimination, the analysis proceeds under the now-familiar *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Rios-Jimenez v. Principi*, 520 F.3d 31, 41 (1st Cir. 2008).

At the outset, IPR contends that Arroyo is not a "disabled" individual under the ADA, though the company later "concedes" that the court "may" find "that Arroyo has

established that he is a disabled individual under the ADA." Docket No. 19 at 21. To the extent IPR did not concede this argument, it lacks merit. The First Circuit has "recognized depression as a mental impairment that may constitute, at least in some circumstances, a disability under federal law." *Calero-Cerezo*, 355 F.3d at 20. Because Arroyo proffered evidence that he has been diagnosed with depression, that he was unable to work on several occasions due to medical leaves from work, and that he eventually requested and obtained disability leave, a reasonable jury could find that Arroyo suffered from a mental illness and that he suffered from this illness while working at IPR. *See Calero-Cerezo*, 355 F.3d at 20 (record evidence supported finding that employee suffered from depression where, among other things, she had been diagnosed with this illness and "required medical leaves from work").

To establish that he was harmed by the alleged discriminatory conduct, Arroyo relies on the same employment actions discussed in the context of the ADEA discrimination claim. For the reasons discuss above, only Arroyo's July 21, 2014 suspension qualifies as an adverse employment action. *See supra* Pt. I.A.2. Arroyo's prima facie case also requires him to show that he was qualified to perform the essential functions of the job. *See, e.g.*, *Sanchez-Figueroa*, 527 F.3d at 213. Importantly, the "plaintiff must" show that he was "qualified at the time of the particular adverse employment action in question." *Buck v. Fries & Fries, Inc.*, 142 F.3d 432 (6th Cir. 1998) (citing *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir. 1998)). IPR expressly "concedes" that Arroyo was qualified to perform the essential functions of his job up to July 23, 2014, when he submitted a medical certificate stating that he needed to take disability leave from his employment. Docket No. 19 at 22. Because Arroyo was suspended two days before July 23, 2014, IPR's concession permits Arroyo to continue on the path toward establishing his prima facie case.

To establish causation, Arroyo cites the same evidence used to establish causation as to his ADEA claim—with the notable caveat that he proffers different remarks made by Betancourt. According to Arroyo, Betancourt also constantly referred to him as "crazy

man." Because Betancourt constantly made these comments, a reasonable jury could infer disability-based animus. *See Quiles-Quiles*, 439 F.3d at 6 (discriminatory animus could be inferred where, among other things, employee's supervisors called employee "crazy" around "five, six, seven times a day"); *Antol v. Perry*, 82 F.3d 1291, 1301 (3d Cir. 1996) (that supervisor "referred to [employee] as 'spasm head' often enough for [the employee] to state that he had become accustomed to it . . supports an inference of" disability discrimination); *Negron-Marty v. Wal-Mart P.R., Inc.*, 862 F. Supp. 2d 48, 66 (D.P.R. 2012) (discriminatory animus could be inferred where three supervisors constantly called employee "crazy old man" on a daily basis). Thus, for largely the same reasons discussed in the context of the ADEA discrimination claim, Arroyo has shown a prima facie case of ADA discrimination. And because, with the caveat noted above, both parties largely rely on the same evidence at the second and third steps of the burden-shifting framework, the ADA claim arising from Arroyo's suspension survives summary judgment for the same reasons stated in the context of his ADEA discrimination claim. *See supra* Pts. I.A. 3, 4.

### C.      Retaliation

An ADA retaliation claim, like a retaliation claim under the ADEA, does not depend on the success of the discrimination claim. *See Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir. 2003). In the absence of direct evidence of retaliation, an ADA retaliation claim, like the ADEA retaliation claim, "is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII." *Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 (1st Cir. 2013). This framework requires a plaintiff to show that: "(1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Calero–Cerezo*, 355 F.3d at 25.

The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this chapter."
42 U.S.C. § 12203(a) (emphasis added). Consistent with the statute's capacious language,
requesting an accommodation from the employer, lodging a disability-discrimination
charge with an appropriate administrative agency (such as the Equal Employment
Opportunity Commission or a state counterpart), and participating in a hearing or
proceeding before such an agency are all considered protected activity. *See, e.g.*, *Freadman
v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007) ("Requesting an
accommodation is protected conduct for purposes of the ADA's retaliation provision").

Here, Arroyo expressly admitted that, within six months of his July 21, 2014
suspension, he did not complain of any discriminatory practice to IPR's human resources
department or IPR's management, or file any type of discrimination charge with a
government agency. SUF ¶ 107. On the other hand, Arroyo testified that in 2013 he
complained to Rivera, who works in IPR's human resources department, about the
disability-related comments. And he also complained to Calo in 2014. These informal
protests of discrimination certainly constitute protected conduct. See *Planadeball*, 793 F.3d
at 175. Thus, a reasonable jury could find that Arroyo engaged in conduct protected by the
ADA in 2013 and 2014.

On the other hand, Arroyo also claims that he engaged in protected activity by
requesting a reasonable accommodation from IPR. The record evidence does not support
this argument. While it is uncontested that Arroyo asked to be transferred to a different
position and to be given a new working partner, he points to no evidence that he ever linked
these requests to his disability such that his supervisors were on notice that he was
requesting reasonable accommodation for a disability, namely, depression. *See supra* Pt.
II.A. Thus, because no reasonable jury could find that Arroyo actually requested a
reasonable accommodation within the meaning of the ADA, a jury could not reasonably
find that Arroyo engaged in protected conduct by making what only appeared to be
mundane requests for changes in the workplace. *See, e.g.*, *Reed*, 244 F.3d at 261 (under the

ADA, "employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace").

To establish that he suffered a materially adverse action, Arroyo complains of the same actions raised in the context of his ADEA discrimination and retaliation claims. In addition, he also claims that IPR retaliated against him by failing to provide a reasonable accommodation. But Arroyo has failed to demonstrate that he "triggered" IPR's duty to provide a reasonable accommodation, and so this alleged materially adverse action need not be entertained by a jury because, at the very least, it lacks evidentiary support. With respect to the other materially adverse actions, a reasonable jury could only find that Arroyo's suspension resulted in a materially adverse action. *See supra* Pts. I.A.2, I.B.2. Ultimately, though, a reasonable jury could not infer a causal connection between Arroyo's ADA-protected conduct and his suspension for the same reasons it could not find such a connection in the context of his ADEA retaliation claim. *See supra* Pt. I.B.3. Thus, summary judgment is granted as to Arroyo's ADA retaliation claim.

### D. Hostile Work Environment

The First Circuit has "assum[ed] that disability harassment under a hostile work environment theory is a viable ADA claim," and this court follows suit. *See Murray v. Warren Pumps, LLC*, 821 F.3d 77, 86 n.1 (1st Cir. 2016). To establish his disability-based hostile work environment claim, Arroyo highlights remarks by Betancourt and Rodriguez, underscoring that these two individuals called him "crazy man." But courts have held that these comments—by themselves—are insufficiently "severe" to establish an actionable harassment claim. *See Mannie v. Potter*, 394 F.3d 977, 980–81 (7th Cir. 2005) (court did not find severe or pervasive disability-based hostile work environment where "supervisors referred to" employee "as 'crazy'"); *Mohammadian v. Ciba Vision of P.R.*, 378 F. Supp. 2d 25, 31 (D.P.R. 2005) (disability-based harassment insufficiently severe where supervisor told employee, among other things, "you are crazy, it shows"). And since Arroyo readily admitted at his deposition that his supervisors called him "Willy" or "stud" in addition to

"crazy man," that "everybody knows [him] at the plant" as "Willy," Docket No. 33-1 at 3, and that Betancourt and Rodriguez were the only two individuals who allegedly made offensive remarks, there is insufficient evidence to show that these remarks were "pervasive." Docket No. 21-2 at 47; *cf. Quiles-Quiles*, 439 F.3d at 7 (court found actionable disability-based harassment claim where employee was "subject to . . . constant ridicule about his mental impairment," which included, among other things, being called "crazy" around "five, six, seven times a day"). Thus, summary judgment is granted as to Arroyo's ADA hostile work environment claim.

## III.   State-Law Claims

Arroyo has brought various claims under state-law counterparts to the federal antidiscrimination statutes, as well as a claim under the general tort statute of the Puerto Rico Civil Code. Specifically, he alleges violation of Law 115, P.R. Laws Ann. tit. 29, § 194a *et seq.*, Law 100, P.R. Laws Ann. tit. 29, § 146, Law 80, P.R. Laws Ann. tit. 29, § 185a *et seq.*, Law 44, P.R. Laws Ann. tit. 1, § 501 *et seq.*, and Article 1802, P.R. Laws Ann. tit. 31, § 5141. IPR has moved to dismiss all the state-law claims.

### A.   Law 115

Law 115, P.R. Laws Ann. tit. 29, § 194a, "protects employees that offer testimony before an administrative, judicial or legislative forum from adverse actions by their employers." *Godoy v. Maplehurst Bakeries, Inc.*, 747 F. Supp. 2d 298, 318 (D.P.R. 2010). Courts have "treated" retaliation claims arising under Law 115 "the same" as retaliation claims arising under Title VII. *See id.*; *Rios v. Municipality of Guaynabo*, 938 F. Supp. 2d 235, 259 (D.P.R. 2013); *Rivera Rodriguez v. Sears Roebuck de P.R., Inc.*, 367 F. Supp. 2d 216, 230 (D.P.R. 2005). Because Arroyo's ADA and ADEA retaliation claims lack merit, his Law 115 claim lacks merit as well. Thus, the Law 115 claim is dismissed.

### B.   Law 100

Law 100, Puerto Rico's "general employment discrimination statute and Title VII's local counterpart, seeks to prevent discrimination in employment by reason of age, race,

color, religion, sex social or national origin or social condition." *Godoy*, 747 F. Supp. 2d at 317. Age-based discrimination claims "asserted under the ADEA and Law 100 . . . are coterminous." *Gonzalez*, 304 F.3d at 73 n.7. Because summary judgment is unwarranted as to the ADEA discrimination claim arising from Arroyo's suspension, summary judgment is also denied as to the Law 100 claim complaining of that same employment action.

      **C.**    **Law 80**

      "Law 80 imposes a monetary penalty on employers who dismiss employees without just cause." *Otero-Burgos v. Inter Am. Univ.*, 558 F.3d 1, 7 (1st Cir. 2009). Under Law 80, a "discharge" includes "the resignation of the employee caused by the actions of the employer directed to induce or compel him to resign, such as imposing or trying to impose on him more onerous working conditions, reducing his salary, lowering his category or submitting him to derogatory criticisms or humiliations by deed or word." P.R. Laws Ann. tit., 29 § 185e. This statutory provision allows an employee to bring a Law 80 claim where he alleges constructive discharge. *Rivera Maldonado v. Hosp. Alejandro Otero Lopez*, 614 F. Supp. 2d 181, 199 (D.P.R. 2009). "The basic elements for a constructive discharge claim [under Law No. 80] are: (1) considerably serious actions by the employer that create an intimidating, hostile and offensive work environment; *and* (2) for the employee to have no other available alternative but to resign." *Id.* (emphasis added) (quoting *Rivera v. DHL Global Forwarding*, 536 F. Supp. 2d 148, 156 (D.P.R. 2008) (internal citation omitted)). Because Arroyo has failed to show a hostile work environment, or that his constructive discharge theory is viable, his law 80 claim lacks merit and is, therefore, dismissed.

      **D.**    **Law 44**

      Law 44 is "Puerto Rico's counterpart to the ADA," and "creates an obligation for any employer to provide reasonable accommodations." *Salgado-Candelario v. Ericsson Caribbean, Inc.*, 614 F. Supp. 2d 151, 175 (D.P.R. 2008); *see also Gonzalez*, 304 F.3d at 74 n.8 (1st Cir. 2002) ("Law 44 claim . . . is coterminous with [an] ADA claim") (citing *Acevedo Lopez v. Police Dep't of P.R.*, 247 F.3d 26, 29 (1st Cir. 2001)). Because summary

judgment is unwarranted as to Arroyo's ADA discrimination claim arising from his suspension, summary judgment is also denied as to the Law 44 claim complaining of that same adverse employment action.

      **E.**      **Article 1802**

An "Article 1802 claim is not cognizable" where it "arises from the same facts as plaintiff's claims under the ADA." *Aguirre*, 59 F. Supp. 3d at 357; *see also Montoyo Rivera v. Pall Life Scis. Puerto Rico, LLC*, No. CV 16-1199 (BJM), 2017 WL 486932, at *2 (D.P.R. Feb. 6, 2017). This is because "the tort provision of the Civil Code is supplementary to special legislation." *Aguirre*, 59 F. Supp. 3d at 357. Indeed, as the Puerto Rico Supreme Court has explained, "Article 1802 constitutes a general source of law" that can serve as a vehicle for "emotional distress damages . . . as long as there is no applicable special law—such as a labor law—that may prohibit or limit such a claim." *Pagan-Renta v. Walgreens of San Patricio, Inc.*, 190 D.P.R. 251 (P.R. 2014) (when construing "a special labor or labor-management law in the context of the remedy sought," the Puerto Rico Supreme Court "has been consistent in construing the statute restrictively" and refusing "to accept the thesis that the lawmaker left the door open to any other relief or cause of action provided by a general statute" like Article 1802). Because Arroyo attempts to shoehorn into the Article 1802 claim the same allegations which form the basis of the claims arising from his employment relationship with IPR, and because he does not otherwise identify distinct tortious conduct that buttresses the Article 1802 claim, the Article 1802 claim is not cognizable under the circumstances of this case. Therefore, Arroyo's Article 1802 claim is dismissed.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. The ADEA, ADA, Law 100, and Law 44 discrimination claims arising from Arroyo's July 21, 2014 suspension survive summary judgment. All other ADEA, ADA, and state-law claims are **DISMISSED**. A jury trial is scheduled to begin on May 1, 2017. The parties are strongly urged to explore settlement.

Arroyo-Flores v. IPR Pharmaceutical, Inc., Civil No. 15-1998 (BJM)                    39

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 9th day of March 2017.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge